IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:19cr178 |
| | ) | |
| JAMES F. MILLER, | ) | Sentencing: December 13, 2019 |
| Defendant. | ) | |

**United States' Sentencing Position**

The United States of America, through undersigned counsel and in accord with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual ("Guidelines"), hereby provides its position with respect to sentencing for defendant James F. Miller. The United States requests that this Court adopt the findings of the Pre-Sentence Investigation Report ("PSR"), which indicates that the appropriate Guidelines range is 24–30 months. Based on that range and the § 3553(a) factors, a sentence of at least 24 months is necessary to capture the seriousness of the defendant's conduct, which cheated taxpayers out of more than $700,000 so that the defendant could finance a wealthy lobbyist's lifestyle. A sentence of at least 24 months also provides for general deterrence in cases, like this one, that are the product of conscious choices by a sophisticated defendant—here, a former attorney with the Department of Justice's Tax Division who exploited his training and experience for personal gain rather than public good. Nevertheless, this defendant has no criminal history and has taken responsibility for his actions, and the sentence imposed by the Court should also take those factors into account in imposing a sentence at the low end of the advisory Guidelines range. Accordingly, a sentence of at least 24 months of incarceration and restitution of $735,933 is warranted, appropriate, and reasonable in this case.

I.   **Factual Background**[1]

Miller, a 67-year-old Virginia resident, is the son of a former U.S. senator and judge on the U.S. Court of Appeals for the Federal Circuit. Miller graduated from Georgetown Preparatory School in Rockville, Maryland, before attending Dartmouth University and graduating from Columbia Law School in 1977. Following his admission to the District of Columbia bar in 1978, Miller worked as an attorney for the Tax Division of the U.S. Department of Justice for approximately four years. After leaving the Tax Division and spending several years at a private law firm, Miller then worked as an associate tax legislative counsel for the U.S. Department of the Treasury from 1989 to 1993.

Following his departure from government service, Miller worked for nearly twenty years as a partner and/or shareholder for a handful of prominent private law firms in Washington, D.C. By 2008, he was earning approximately $800,000 per year as a lobbyist for one of those firms. In 2010, Miller also obtained more than $36,000 from a client who paid him directly for lobbying services. In late 2010, Miller moved to another law firm, where he earned more than $600,000 per year. In total, Miller earned more than $1.1 million in total income reportable in tax year 2010 and approximately $692,186 in total income reportable in tax year 2012.

In or about March 2012, Miller left law firm practice and started his own lobbying firm, Tax Legislative Solutions LLC ("TLS"). Miller advertised himself on the TLS website as a former Department of Justice Tax Division attorney and senior official in the U.S. Department of the Treasury. Over the next three years, Miller earned more than $2.25 million in gross receipts from his TLS clients.

---

[1] The PSR and the Statement of Facts ("SoF") signed by the defendant, Doc. No. 7, adequately set forth the offense conduct in this case.

But around the same time he founded his own tax lobbying firm, Miller also began to cheat on his taxes. More specifically, Miller reached out to a website in October 2012 for assistance with his 2010 and 2011 tax returns. Miller only provided the website with one of the two pertinent Schedule K-1s from his law firm partnership income that was reportable for tax year 2010 and did not provide any information regarding the more than $36,000 in direct client payments he received in 2010. As a result, the return the website provided to Miller and that Miller ultimately filed underreported his total income as only $315,434 when it was in fact more than $1.1 million. With regard to his 2011 return, Miller actually provided the correct Schedule K-1 information to the website, but then asked it to alter the tax return it sent back to him. When the website refused, Miller then changed his 2011 tax return before he filed to report only part of his law firm partnership income from that year, ultimately filing a false return reporting only $440,000 in total income when Miller's total income was actually $692,186.

After filing the false returns in October 2012 for tax years 2010 and 2011, Miller continued his filing of false tax returns when he began filing returns for his independent lobbing work through TLS. In March 2014, Miller filed a 2012 tax return that wholly omitted his partnership income from the law firm he left that year and falsely reported his total gross receipts from TLS as $315,000. His actual gross receipts were in fact nearly double that amount. Later in 2014, Miller filed a 2013 tax return that falsely reported his TLS gross receipts as $480,000 when he had actually received $780,000. And in 2015, Miller filed a 2014 tax return that falsely listed his TLS gross receipts as $420,000, when his actual gross receipts were slightly more than twice that amount: $850,000.

In total, Miller's five false tax returns understated his gross income by more than $2.2 million, thus underreporting his tax liabilities for those years by approximately $735,933. During

that time period, Miller's expenditures included more than $1 million in American Express credit card payments, more than $400,000 in mortgage payments, more than $125,000 in car payments, and nearly $300,000 in other credit card payments. In May 2019, Miller agreed to plead guilty to filing a false tax return, and in June 2019, Miller entered that plea before this Court.

**II.     Guidelines Calculation**

As the Court is well aware, although the Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005). Thus, at sentencing a court "must first calculate the Guidelines range." *Nelson v. United States*, 555 U.S. 350, 351 (2009). Here, the United States agrees that the appropriate Guidelines range with respect to incarceration is 24–30 months. That includes a base offense level of 20 based on a tax loss of over $550,000 and less than or equal to $1.5 million and a 3-level reduction for the defendant's acceptance of responsibility and timely notification to the United States of his intention to pled guilty.[2] The United States asks this Court to adopt the PSR's findings and advisory Guidelines range.

**III.    Section 3553(a) Factors**

As the Court is also well aware, after calculating the Guidelines, a sentencing court must then consider that Guidelines range, as well as the sentencing factors set forth in § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). With respect to

---

[2] As noted here, the PSR includes a three-level decrease for acceptance of responsibility. In this respect, the United States agrees that the defendant qualifies, pursuant to U.S.S.G. § 3E1.1(a), for a two-level reduction. In addition, the defendant timely notified the United States of his intention to plead guilty, thus permitting the United States to avoid preparing for trial and to allocate its resources more efficiently. Accordingly, the United States hereby moves, pursuant to § 3E1.1(b), to decrease the defendant's offense level by one additional level.

§ 3553(a)'s enumerated factors, relevant here are the "nature and circumstances of the offense" and the need for the sentence "to reflect the seriousness of the offense," "the history and characteristics of the defendant," and the need for the sentence "to afford adequate deterrence to criminal conduct." § 3553(a)(1), (a)(2)(A), (a)(2)(B). As explained below, based on those factors, a term of incarceration of at least 24 months is appropriate in this case.

> A. *A 24-month sentence accounts for the nature, circumstances, and seriousness of falsely filing five tax returns that underreported more than $2.2 million in income.*

The tax crime in this case is serious. Taxpayers depend on wealthy law firm partners and private lobbyists like Miller to pay their fair share in taxes and report their earnings accurately, and any abuse of the system can cause significant deficiencies in vital tax revenue. Here, taxpayers lost more than $700,000 in revenues that should have gone to fund public services, but instead went to fund car payments, a mortgage, and credit card bills for a wealthy lawyer. Moreover, this crime was not the product of a one-time lapse in judgment. Rather, Miller filed five separate false tax returns over the course of three years. And the only apparent motive, each and every time, was flat-out greed. As such, a sentence of at least 24 months is necessary to account for the nature, circumstances, and seriousness of the offense.

> B. *The personal history and characteristics of this defendant, a former Tax Division lawyer and wealthy tax lobbyist, support a sentence of at least 24 months.*

It is true, as the PSR notes, that Miller does not have a criminal history. And the sentence imposed by this Court should account for Miller's willingness to enter a preindictment guilty plea fully accepting responsibility for his conduct. Both of these factors support a sentence at the low end of the advisory Guidelines range.

But Miller's remaining personal history and characteristics demand a sentence of no less than 24 months. Miller is a graduate of an expensive D.C. private school, the son of a U.S. senator

and federal judge, Dartmouth graduate, and alum of Columbia Law School. At Columbia, Miller took at least three courses in tax law, and his first job out of law school was with the Tax Division of the U.S. Department of Justice. He also worked in tax policy for the U.S. Department of the Treasury. More than twenty years before his scheme began, this defendant knew more about tax law than most U.S. citizens learn in their lifetimes.

And Miller capitalized on that knowledge to great personal benefit. Over nearly twenty years in private practice, he worked as a law firm shareholder, partner, and lobbyist for some of the most well-known law firms in D.C. He used his connections in government to advance his career and ultimately earn more than $1.1 million in total income during his penultimate year as a law firm lawyer. Miller earned nearly $700,000 in his last year of private practice, and then he started his own lobbying firm. A *tax* lobbying firm. As he did so, he trumpeted his tax expertise to anyone who would listen, calling himself a "noted legislative strategist who has over 30 years of experience in representing clients on tax policy matters." SOF ¶ 7.

But it was precisely when he began to work outside the structure of a law firm and under the auspices of his own tax lobbying firm that Miller chose to cheat on his taxes. He knew that the tax system relies on wealthy people like him who receive Schedule K-1 partnership income from big law firms to report that income voluntarily. But he chose not to do so, instead deliberately holding back one of those Schedule K-1s from his 2010 tax return. When he submitted an accurate Schedule K-1 to a website to fill out a tax return for him, he then specifically asked the firm operating that website to alter his tax return. They refused, so Miller altered the return himself before filing it.

Thereafter, despite raking in more than $2.25 million in gross receipts—again, it bears repeating, from *tax* lobbying—Miller continued to file false tax returns. And he did not do so

because of an unexpected tragedy or desire to help others. He chose to file those false tax returns because all the while, he was racking up more than $1 million in credit card bills, funding more than $125,000 in car payments, and paying more than $400,000 towards a mortgage. Indeed, even though he has pled guilty and expressed contrition, the defendant is funding two separate Lexus payments totaling more than $1,800 each month to this day. That alone totals more than the federal poverty guidelines for a household of three.[3]

As Miller put it to the Probation Officer who prepared the PSR, he "knows better." PSR ¶ 38. He knows better than most defendants, knows better than most lawyers, and even knows better than most tax lawyers. As such, a sentence of at least 24 months is necessary to account for this particular defendant's personal history and characteristics.

    C.    *General deterrence also justifies a meaningful term of incarceration of at least two years in this case.*

The nature of the federal system of taxation and the nature of tax crimes reveal how important general deterrence is to consider in cases like this one.[4] The taxation system is a largely voluntary one, meaning that taxpayers rely on both businesses and individuals to comply with their tax obligations. Uncovering violations of this system can often involve significant time and resources, thereby further magnifying the harm caused. Thus, Miller's sentence must serve as a deterrent to other would-be tax fraudsters who can conceal partnership income and fudge their firm's gross receipts to line their pockets. When already wealthy tax lawyers make the decision to

---

[3] *See* HHS Poverty Guidelines for 2019, *available at* https://aspe.hhs.gov/poverty-guidelines (last accessed December 5, 2019).

[4] Indeed, the Sentencing Commission made a point of discussing the importance of general deterrence to tax crimes. *See* U.S.S.G. § 2T, introductory comment ("Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines").

commit tax fraud, they tilt the playing field even further in their favor, thereby harming the many diligent citizens, lawyers, and even lobbyists who faithfully comply with their tax obligations—succeeding or failing on their merits, rather than by cheating the system. It is therefore critical for this defendant's sentence to show that there are real and significant consequences to giving into this temptation.

### IV. Conclusion

For the reasons stated, the United States requests that this Court impose a sentence of at least 24 months and full restitution of $735,933. A proposed restitution order is attached.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

Richard E. Zuckerman
Principal Deputy Assistant Attorney General
Tax Division, U.S. Department of Justice

By: _____/s/_____
Ryan S. Faulconer
Special Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314
Phone: 703-299-3700
Fax: 703-299-3981
Email: ryan.faulconer2@usdoj.gov

By: _____/s/_____
Terri-Lei O'Malley
Trial Attorney
Tax Division, U.S. Department of Justice
Criminal Enforcement Section
150 M. Street, N.E.
Washington, DC 20002
Phone: 202-514-2199
Email: terri-lei.omalley2@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that on December 6, 2019, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing ("NEF") to all counsel of record.

                            By:    _____/s/_____
                                       Ryan S. Faulconer
                                       Special Assistant United States Attorney